UNITED STATES of America

v.

Ronald T. AKINS, Carmack Odom, Jr. a/k/a "Ivan Wright".

No. 3:97–00068.

United States District Court, M.D. Tennessee, Nashville Division.

Feb. 20, 1998.

798

Sonny A.M. Koshy, Nashville, TN, for Plaintiff.

Carl Douglas Thoresen, Nashville, TN, Ernest Wilson Williams, Franklin, TN, for Akins.

Jack Edward Seaman, Nashville, TN, for Odom.

## MEMORANDUM

JOHN T. NIXON, Chief Judge.

Pending before the Court is the Defendants Ronald T. Akins and Carmack Odom's respective Motions to Suppress (Doc. Nos. 35 & 36), both of which the Government opposes. Also pending is the Defendant Ronald T. Akins' Motion for Severance of Defendants (Doc. No. 37). The Court conducted a hearing and heard testimony with respect to these two matters from August 11–12, 1997. All parties submitted proposed findings of fact and law subsequent to the hearing. For the reasons set forth below, the Court denies the Defendants' Motions to Suppress in part and grants them in part, and grants Defendant Ronald T. Akins' Motion for Severance.

## I. FINDINGS OF FACT

Having heard testimony from Drug Enforcement Agency ("DEA") Task Force Agents Ricky Stewart ("Stewart") and Ron Delton Riddle ("Riddle"), and from Defendant Carmack Odom ("Odom"), and reviewed the record in this case, the Court makes the following findings of fact:

On April 28, 1997, Officer Riddle was on duty at the Nashville International Airport. TR1 at 6–7.[1] As part of his job, Riddle reviewed Passenger Name Records ("PNR's"), documents compiled by the airlines which list the name, method of payment, home phone number, time, and flight information of passengers making reservations. TR1 at 95. He noticed three reservations which he considered to be suspicious. The reservations, made on April 28, 1997, were for persons whose names were listed as Ivan Wright, Ronald Akins, and Howard Lillard, for travel on the same flight between Nashville and Los Angeles, California. _Id._ The reservations were made within six min-

utes of each other, and were only for one-way travel. Two of the passengers, Akins and Wright, purchased their tickets at around the same time, with cash, on the day of the flight. _Id._ The third, Lillard, also purchased his ticket with cash about an hour and a half after Akins and Wright did so. _Id._ All three men made return reservations approximately three hours after arriving in Los Angeles, for a flight which was set to depart the following day. TR1 at 96. Again, the tickets were paid for in cash. _Id._ The call-back numbers they listed on their reservations back to Nashville had a Los Angeles area code and were similar: Wright's number was 410–1224, Lillard's was 417–1224, and Akins was 410–1270. TR1 at 96–97. These flights were also suspicious in that they were destined for a source city: many narcotics purchasers buy their drugs in Los Angeles to transport back to Nashville, in order to take advantage of lower prices. TR1 at 98. Riddle concluded that from his experience as a narcotics agent, all three of these men were traveling together and exhibited the typical characteristics of drug couriers. TR1 at 97. Riddle also had reason to believe that Akins was involved in drug activity because Riddle had previously arrested Akins' twin brother, Donald, on drug trafficking charges, and had been informed by other officers in the nearby town of Murfreesboro that Ronald Akins had also been arrested for sale or possession for resale of marijuana. TR1 at 7, 93–94, 98.

Riddle telephoned Stewart on the evening of April 29, 1997, and asked Stewart to accompany him at the airport to await the arrival of the flight. TR1 at 6–7, TR3 at 47. The two officers arrived at the gate and noticed that one of the first people to exit the plane bore a physical resemblance to Donald Akins. TR1 at 7–8. This person was later identified as Donald Akins' twin brother, Ronald. TR1 at 99. The officers noticed that after leaving the gate, Ronald Akins hesitated in the middle of the concourse and appeared to be looking for someone. TR1 at 9. He made eye contact and nodded to anoth-

---

1. Throughout this opinion, TR1 will refer to Volume I of the transcript of the hearing on the Motion to Suppress before this Court on August 11, 1997; TR2 will refer to Volume II of the transcript of the hearing on the motion to sup-

press before this Court on August 12, 1997, and TR3 will refer to the transcript of the Preliminary/Detention Hearing, held before the Honorable William J. Haynes, Jr., on May 2, 1997.

er passenger, who the officers later learned was flying under the name Howard Lillard, but whose real name was Jesse Davidson. TR1 at 99. Akins then walked over to the pay phone and picked up the receiver. However, the officers did not observe him to actually deposit money into the phone, or to dial any numbers. TR1 at 9. Akins whistled and motioned to Davidson, and Davidson walked towards Akins, and stood about thirty feet away from him. TR3 at 5. After a few minutes, Akins hung up the phone and he and Davidson continued down the concourse together. TR1 at 10.

Officers Riddle and Stewart followed behind them. *Id.* The officers noticed that Akins looked behind him several times as he walked down the concourse, and made eye contact with a third man, who appeared to nod to him. TR1 a 10–11. It was later discovered that this third man was Carmack Odom ("Odom"). TR1 at 11. At that point, the officers decided to split up: Stewart approached Akins and Davidson, and Riddle contacted Odom. TR1 at 11, 100.

Riddle approached Odom as he was standing in the middle of the concourse. Odom was carrying a blue and green duffel bag tightly under his arm. TR at 101. Riddle identified himself as a DEA agent, and asked to see Odom's identification. Odom placed the duffle bag under his feet, and searched all of his pockets in an abrupt, brisk manner, leading Riddle to believe that he was nervous. He eventually produced an airplane ticket which bore the name "Ivan Wright." Riddle recognized the name as one of the ones he had pulled on the PNR. TR at 102. Riddle then asked Odom for some picture identification, and Odom produced one in the name of Ivan Wright. Odom then indicated he needed to use the restroom. Riddle permitted him to go, and followed him there. Fearing that Odom might flush any narcotics in his possession down the toilet, Riddle stepped into the restroom first.

Instead of going into the restroom, however, Odom took the opportunity to run away, carrying his bag with him. TR1 at 103. Riddle ordered him to stop and pursued him. He was able to tackle him just outside the airport at the edge of the curb. TR1 at 104. When Odom hit the ground, a pill bottle containing dilaudid, a bag of crack cocaine, a

pack of cigarettes and some airline food packets fell from his person. TR1 at 105. Riddle stabbed his finger into Odom's back, pretending that it was a gun, and held Odom to the ground until an airport security officer came and provided handcuffs. Before Riddle could get to it, however, a car ran over the pill bottle that had fallen during the struggle. Riddle picked up the pieces, placed them in Odom's hat, and took possession of Odom's duffel bag. He also advised Odom that he was under arrest, and read him his *Miranda* rights. TR1 at 106. Riddle then escorted Odom to the DEA Interdiction office.

In the meantime, Stewart had presented his DEA credentials to Akins and Davidson at the security checkpoint and asked the two men if they would be willing to speak with him. TR1 at 12. Both men agreed to do so. Ronald Akins insisted that Stewart search him immediately. Stewart testified that to this end, Akins even unbuttoned his pants, and started to pull them down. TR1 at 13. Believing that this behavior was causing a commotion, Stewart asked Akins to relax. He then attempted to obtain identification from Davidson, but his attempts to question him were somewhat frustrated because Akins would repeatedly interject his request to be searched and "get this over with." TR1 at 14.

After a period of time, Akins asked Stewart if they could "take this into the bathroom." TR1 at 15. The three men then stepped into a restroom which was located to their right. Once inside, Stewart identified himself and his purpose for questioning them more fully. He also asked the men to identify themselves, to state the purpose of their travel, and asked if either of them were carrying large sums of money, narcotics proceeds, or narcotics. Akins indicated that he had some money with him, and pulled out three thousand dollars from his pants pocket. TR1 at 16. Akins also produced his boarding pass, and explained that he had traveled to California to purchase a car. TR1 at 17. Stewart then conducted a cursory pat-down of Akins, and squeezed his pockets to determine if he was carrying anything inside. TR1 at 19. He noticed that Akins was wearing two pairs of pants, which is a common

method of hiding narcotics. However, he was unable to find any narcotics in Akins' possession. When asked, Akins denied being acquainted with Davidson, or in general with anyone else on his flight. *Id.* Before anything further transpired, however, Stewart heard over the radio about Odom's attempt to flee, and asked Akins and Davidson to accompany him to the general vicinity where Riddle was present. On the way, Stewart received word that Riddle had custody of Odom, and asked Akins and Davidson to accompany him to the DEA Interdiction Office. The two men complied. TR1 at 21. Stewart, Akins, and Davidson were already present at the DEA office by the time Odom and Riddle arrived. TR1 at 107. Akins and Davidson were informed that Odom had attempted to flee, and had been caught carrying narcotics.

The officers then began to question each of the men individually. Riddle first took Davidson aside for questioning. Davidson stated that he was a friend of Akins, and had flown to Los Angeles with him because Akins offered him a free ticket. TR1 at 108. However, he denied being acquainted with Odom. Riddle read him his *Miranda* rights, and searched him. He found a crack pipe stored in the pocket of his waistband. TR3 at 10. Riddle then directed Davidson back to the area where Akins was sitting, and noticed Akins' wallet on the table. Without first obtaining Akins' consent, and for the purpose of finding additional evidence, Riddle searched the wallet and discovered a piece of paper containing the names "Ivan Wright, Howard Lillard, and Ronald Akins," reservation numbers, and flight times for the flights to Los Angeles. TR1 at 109.

·Riddle next took Odom outside for questioning. He asked Odom to reveal the contents of the bag, and Odom indicated that it might contain narcotics. Odom gave Riddle his consent to search the bag. Inside, Riddle discovered four kilograms of powder cocaine, a Southwest Airline ticket, and a social security document with Carmack Odom's real

name. It was at that point that Riddle discovered that Odom had been flying under an assumed name. He recalled that Odom had previously been interviewed by DEA agents at the Nashville airport.[2] TR1 at 110–11. Odom indicated that he had used his life savings to buy the cocaine, and that he was a drug dealer. TR3 at 13.

During this time, Stewart was in the process of interviewing Akins. Akins advised Stewart that he would refuse to make further comments until he spoke to his lawyer. TR1 at 25. Accordingly, Stewart read him his *Miranda* warnings, searched him, and proceeded to compile a personal history. After a few minutes, Akins commented to Stewart, "I don't get it." Stewart asked him to explain what it was that he didn't "get," to which Akins responded: "How are you holding me when I had them to say that the dope is theirs." TR1 at 29, 79. Stewart immediately stood and asked Riddle if he had heard Akins' comment. Riddle had not, but when Stewart requested that Akins repeat his statement, Akins refused. TR1 at 29.

A K–9 officer and his dog were then called to search the DEA Interdiction room. The canine indicated positively for the smell of narcotics in the desk drawer where the three thousand dollars that was taken from Akins was kept, and in the duffel bag that was carried by Odom and contained the cocaine. TR1 at 33, 112. Thereafter, the Defendants were taken to the Metropolitan jail for processing and overnight detention. TR1 at 30. The officers confiscated the three thousand dollars that were found on Akins' person, and, following standard procedure, converted the cash to a cashier's check the following day. TR1 at 112.

On the return trip from jail, the officers' curiosity was aroused by the fact that Akins appeared overly concerned about his car keys, more so than for the $3,000 cash that had been taken from him. TR1 at 31. The officers suspected that Akins may have in fact driven to the airport, rather than taken a

---

2. Riddle had noticed, from his review of the PNR's, that a passenger by the name of Carmack Odom had traveled on five or six separate occasions between Los Angeles and Nashville, and had usually purchased his tickets at the last minute with cash. In some of these flights, Donald

Akins was also a passenger. TR3 at 3. Odom had previously been stopped by DEA agents in both Nashville and Los Angeles, and both times no drugs or large amounts of money had been found on him. TR3 at 17.

taxi cab as he had claimed earlier. TR1 at 31. After further investigation, the officers were able to locate Akins' BMW parked at the airport. Clearly visible on the dashboard was a Tennessee Identification Card bearing the name "Carmack Odom." The officers impounded the car, and did an inventory search of it. TR1 at 38. Inside, they found a locked gray tool box containing $32,219 in cash (for which a canine indicated positively for the scent of drugs), some jewelry and other miscellaneous property. TR1 at 119. Again, following standard procedure, the officers converted the cash to a cashier's check the following day. TR1 at 119.

Akins and Odom were subsequently charged with drug conspiracy, and possession of cocaine, crack cocaine, and hydromorphone (dilaudid) with intent to distribute. Davidson was not charged in this indictment. The Defendants have challenged several issues with respect to the officers' conduct in arresting the Defendants and seizing the Defendants' property. Specifically, the Defendants contend that:

1. Carmack Odom was illegally seized prior to the time that he fled from Officer Riddle;

2. The illegal seizure of Carmack Odom so tainted the items seized from him and the statements that he made to the officers that they could not be used against him in trial;

3. The government impermissibly seized Akins in violation of the Fourth Amendment;

4. The seizure of Akins' cash violated the Fourth Amendment;

5. The search of Akins' wallet violated the Fourth Amendment;

6. The search and seizure of Akins' vehicle violated the Fourth Amendment;

7. The conversion of the cash to a cashiers' check violated Due Process; and

8. The positive dog alert to the money is irrelevant evidence.

Furthermore, Defendant Ronald Akins has moved to sever his trial from that of his co-defendant, Carmack Odom, asserting that Carmack Odom has indicated a willingness to testify in Akins' behalf, and would be prevented from doing so in a joint trial.

## II. DISCUSSION

### A. *Stop and Seizure of Carmack Odom*

■ The record indicates that Odom's initial contact with the DEA officers was consensual. Consent to search, if freely and voluntarily given, allows police officers to search a suspect without first obtaining a warrant. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *see also United States v. Cooke,* 915 F.2d 250, 252 (6th Cir.1990) ("consent must be unequivocal and intelligently given, untainted by duress or coercion"). However, a suspect can delimit the scope of his consent, or withdraw it completely, at any time. *Florida v. Jimeno,* 500 U.S. 248, 252, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *United States v. Jachimko,* 19 F.3d 296, 299 (7th Cir.1994). The government has the burden of proving that consent was in fact given freely and voluntarily. *Schneckloth,* 412 U.S. at 222. This inquiry involves a question of "fact to be determined from the totality of the circumstances." *United States v. Taylor,* 956 F.2d 572, 577 (6th Cir.1992) (quoting Schneckloth, 412 U.S. at 227).

Odom himself testified that Riddle sought his consent before detaining him. TR2 at 215. Odom agreed to speak with Riddle, although expressed that he could do so for only a short while, because he was in a hurry. *Id.* While it is clear that Odom intended to limit the length of the encounter, the officer's initial approach was justified as consensual.

■ Even if Odom had not given his consent, however, Riddle had a sufficient basis to stop him under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Police can conduct a warrantless arrest of an individual in two circumstances: an investigatory stop under *Terry,* and an arrest which is based on probable cause. *United States v. Richardson,* 949 F.2d 851, 856 (6th Cir.1991). Under *Terry,* police may detain an individual for a brief period of time if the police officers have "reasonable articulable suspicions which are based both on objective and particularized observations about the person seized." *United States v. $53,082.00 in U.S/ Currency,* 985 F.2d 245, 249 (6th Cir.1993). *Terry* stops are an exception to the probable cause

requirement, and as such, are strictly circumscribed. *Richardson*, 949 F.2d at 856. The length of a *Terry* stop is limited to the amount of time it takes an officer to confirm or dispel his or her suspicions. *Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Furthermore, an officer can conduct a cursory pat-down of the suspect, but only for the purpose of finding possible weapons. *Terry*, 392 U.S. at 24; *Richardson*, 949 F.2d at 856. If an officer exceeds these limitations, an investigatory stop can become an arrest. *Richardson*, 949 F.2d at 856.

■ In the case at bar, Riddle's initial contact with Odom was brief, and supported by reasonable and articulable suspicions that Odom was engaged in criminal conduct. First, Riddle knew, at the time he stopped Odom, that he exhibited some of the typical characteristics of a drug courier. Odom had traveled to a source city, purchased one-way tickets, paid for his tickets in cash hours before his flight was set to depart, and stayed in his destination city only overnight. Riddle had also reason to believe, from the similarity in their flight arrangements, that Odom was likely traveling with Ronald Akins, a person who had been previously arrested on narcotics charges at the airport. He also observed that he acted suspiciously when he exited the airplane, keeping a distance from Akins and Davidson, but making eye contact and nodding at them. Odom thus appeared to be attempting to conceal the fact that he was traveling with Akins and Davidson.

■ The first of these factors, Odom's method of travel, is significant because it identifies Odom as fitting the typical characteristics of a drug courier. However, the drug courier profile, while helpful to drug enforcement officers in identifying possible traffickers of narcotics, cannot in and of itself suffice to support a *Terry*-type investigatory stop. *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). Courts are hesitant to attribute undue weight to the drug courier profile because it is overbroad, and its definition somewhat amorphous. Not only does it describe conduct which is typical of drug couriers, but also that which can be expected of legitimate travelers. *$53,082.00*, 985 F.2d at 249. As explained by the Supreme Court, the drug courier profile "describe[s] a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation could justify a seizure." *Reid*, 448 U.S. at 441. Nevertheless, the drug courier profile can be used to justify a *Terry* stop if supported by other evidence. *$53,082.00*, 985 F.2d at 250. In other words, while the drug courier profile can provide an objective basis for believing that a person is engaged in illicit activity, the officers must also be able to point to some behavior, specific to the individual, that supports their suspicions. *See Reid*, 448 U.S. at 441 (affirming that a sufficient amount of conduct particular to an individual is needed to justify an investigatory stop). Here, the Court believes that Odom's conduct as he exited the terminal, coupled with the fact that he had been suspected of associating with individuals convicted of drug offenses, provided a sufficiently particularized basis to stop Odom.

The Court's reasoning is best illustrated by a comparison to the Supreme Court decision in *Reid, supra*. In that case a DEA agent observed that the defendant had arrived at the airport from Fort Lauderdale early in the morning, when police activity was diminished. The defendant was alone as he walked through the airport, but turned to look at another individual periodically. When he reached the main lobby, he spoke briefly with this other individual, and the two then walked out of the airport together. The DEA agent stopped them, and asked to see their identification and airline tickets. The ticket stubs indicated that the two men had stayed in Fort Lauderdale for only a day. The two men also appeared to be nervous as they spoke with the agent. The agent then asked them to return to the terminal with him and to consent to a search of their bag. Both men consented, but immediately thereafter ran away, abandoning their bag. It was later discovered that the bag contained cocaine. *Reid*, 448 U.S. at 439.

The Court held that the officer did not have reasonable and articulable suspicion to stop the defendant. The defendant's flight

arrangements, which were typical of the method of travel of drug couriers, were not inherently suspicious. They could easily have been exhibited by innocent travelers. *Id.* at 441. The only suspicious conduct particular to the defendant was the manner in which he and his companion walked through the airport concourse. The Court was not persuaded that this course of conduct was sufficient to justify even an investigatory stop. *Id.*

In the instant case Riddle stopped Odom based on information similar to that in *Reid.* As in *Reid,* Riddle determined that Odom fit the drug courier profile, and observed that Odom was attempting to distance himself from his suspected traveling companions. However, Riddle also had reason to believe that Odom was traveling with Akins, a person who had previously been arrested on narcotics charges at the airport. This item of information was crucial, as it was a direct link to possible criminal activity. Unlike in *Reid,* where the officers stopped the defendant based on little more than a sophisticated "hunch," here, the officers had a concrete basis to connect Odom to criminal conduct. This evidence was sufficiently particularized to support the investigatory stop of Odom. *See United States v. Baro,* 15 F.3d 563, 568 (6th Cir.1994) (evidence of contraband probative in determining probable cause to seize suspect's property). It also appears from the record that this encounter lasted only a few minutes, and thus did not overstep the limits of a *Terry* stop. *See United States v. Knox,* 839 F.2d 285, 291 (6th Cir.1988) (investigatory stops must last no longer than the time necessary to confirm or dispel an officer's suspicions) (quoting United States v. Sharpe, 470 U.S. 675, 686–87, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)).

The Court's next task is to determine whether, at the point that Riddle tackled Odom, he had probable cause to do so.[3] It is clear from Supreme Court precedent that a seizure occurs once an officer applies physical force to restrain movement, or, if the defendant resists, once he or she has submitted to an officer's authority. *California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *accord United States v. Williams,* 949 F.2d 220, 222 (6th Cir.), *cert. denied,* 504 U.S. 958, 112 S.Ct. 2308, 119 L.Ed.2d 229 (1992). Thus, once Odom had been physically restrained and arrested by Riddle, he had been seized. While the seizure of an individual must normally be effected pursuant to an arrest warrant, an arrest warrant is not necessary if the officer has probable cause to believe that a felony has been committed and that the suspect committed the felony. Probable cause to arrest exists if "at the moment the arrest was made ... the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *United States v. Dotson,* 49 F.3d 227, 230 (6th Cir.) (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)), *cert. denied,* 516 U.S. 848, 116 S.Ct. 141, 133 L.Ed.2d 87 (1995). Probable cause has also been described as a "reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion." *$53,082.00,* 985 F.2d at 249 (quoting *United States v. $67,220 in United States Currency,* 957 F.2d 280, 284 (6th Cir.1992)).

At the time Riddle seized Odom, he was aware of the following additional infor-

---

**3.** At the suppression hearing, although not in the written briefs submitted to the Court, the Government hinted that Stewart had probable cause to arrest Odom on the basis of a state law which makes it an offense to fail to heed an officer's command to halt. TR1 at 105. However, the Government mischaracterizes the law. Tenn. Code Ann. § 39–16–602(a) provides that:

"it is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer ... from effecting a stop, frisk, halt, arrest, or search of a person, including the defendant, by using

*force* against the law enforcement officer, or another."

(Emphasis added.) Force is defined earlier in the statute as "compulsion by physical power or violence," and is to be constructed liberally. Tenn.Code Ann. § 39–11–106(a)(12). By any stretch of the word, however, Odom's attempt to flee can not be considered to have been accomplished by force. He did not touch or exert force on the officer himself or on any bystanders to facilitate his flight. Thus, since Odom did not violate this statute, the statute can not be used to justify Odom's seizure.

mation. First, Riddle was able to confirm, by obtaining his identification and boarding pass, that the person he had stopped was indeed the third person he had identified from the PNR's. Second, Riddle observed that Odom appeared nervous. Finally, Odom had attempted to flee from the Officer's presence.

The Court concludes that these three factors, and in particular the last factor, was sufficient to ripen Riddle's reasonable articulable suspicions into probable cause to arrest. In *Dotson, supra,* for example, the Sixth Circuit upheld the seizure of an individual who was suspected of money laundering. The individual had placed a $5,000 cash deposit on an Acura Legend at a car dealership. He returned later in the day with the remainder of the purchase price, and asked the dealership to title the car in his mother's name, Daisy Young. The car dealership conveyed this information to the police, who then checked Daisy Young's tax returns. They discovered that in her last tax return, she had reported an income of only $5,000. The officers were present at the dealership a few days later when the defendant returned to pick up the title to the car. 49 F.3d at 228. The officers approached the defendant as he began to exit his vehicle upon his arrival at the car dealership. Despite the officer's request that the defendant remain in the car, he began to run. He was apprehended shortly thereafter by the officers. *Id.* at 228-29.

The Sixth Circuit determined that the officers had reasonable articulable suspicions to stop the defendant initially on the basis of *Terry.* They then determined that under the particular circumstances of the case, the defendant's "attempt to flee ripened ... [the officer's] reasonable suspicion into probable cause to arrest." *Id.* at 230. Under similar reasoning, this Court concludes that in the present case, Odom's attempt to flee converted Riddle's reasonable suspicions into probable cause to justify the arrest.

Consequently, the duffle bag which was seized from Odom, and its contents are admissible as obtained through a valid inventory procedure subsequent to arrest. TR1 at 115. As explained by the Supreme Court in *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), "it is not 'unrea-sonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." *Id.* at 648. Odom has not asserted that this search was not conducted pursuant to established inventory procedures. Even if that *had* been the case, Odom was eventually transported to the police station, and the contents of the bag would have been inevitably discovered there through the department's inventory procedure. "[I]f the government can prove that the evidence would have been obtained inevitably, and therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury ....." *Nix v. Williams,* 467 U.S. 431, 447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Furthermore, any statements that Odom made to police after he was arrested are admissible because Odom was properly *Mirandized,* and did not invoke either of his Fifth Amendment rights to the presence of an attorney during custodial interrogation or to remain silent. TR1 at 111–112; *see Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (police must cease an interrogation if the suspect asserts his right to remain silent; if the suspect asks to see an attorney, police may not interrogate further until an attorney is present).

### B. *Seizure of Ronald Akins*

Akins submits that his initial contacts with Stewart were consensual, but that he withdrew all consent when he was taken to the interdiction room and refused to make further comments until he spoke to his lawyer. The Court agrees that the initial contact between Akins and Stewart occurred with Akins' consent. When he first approached Akins, Stewart asked him if he would be willing to talk. He was wearing plain clothes, and although he flashed his badge, he did not use any kind of force or duress to obtain Akins' cooperation. Akins not only agreed to speak with him, but also offered to allow himself to be searched. It was Akins who suggested that he, Davidson, and Stewart continue the interview in the restroom. While in the restroom, Akins voluntarily

showed Stewart the three thousand dollars in his possession. Stewart did not confiscate the money, but instead returned it to Akins. Akins also gave his consent to the limited pat-down search of his person that Stewart conducted in the restroom. Furthermore, Akins voluntarily accompanied Stewart to the DEA interdiction room. There is no evidence that Akins objected to the interaction between Stewart and himself prior to the time that he arrived at the DEA interdiction room.

■ Once in the DEA interdiction room, however, Akins invoked his Fifth Amendment right to counsel by stating that he would refuse to answer any more questions without the presence of his attorney. At that point, Akins effectively withdrew his consent to speak with the officers, and by extension, his consent to be searched. Any further intrusion into his person or property thus has to be justified independently.

It is further evident from the record that once Akins asserted his right to counsel, his further detainment constituted a seizure. As noted above, under the Fourth Amendment, a person is seized "when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The inquiry requires an analysis into the state of mind of a reasonable person in the suspect's situation: if, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," then that person has been seized. *Id.* at 554. As long as a person has the ability to disregard an officer's questions and walk away, however, no seizure has occurred. *Id.* The court must look to the totality of the circumstances to determine whether this standard has been met, including the officer's conduct and the setting in which the interaction occurred. *Id.; accord Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *Richardson*, 949 F.2d at 855.

■ Having concluded that Akins was seized at the point at which he requested an attorney, the Court must further determine what kind of seizure occurred. As explained above, seizures of persons for the purposes of

the Fourth Amendment can come in two forms: a *Terry* stop, discussed *supra*, and an arrest, which involves a higher degree of intrusion into one's personal freedom. Although the meaning of an "arrest" has not been precisely defined, an arrest entails, in a broad sense, the "deprivation of liberty under the authority of law." *United States v. McCaleb*, 552 F.2d 717, 720 (6th Cir.1977). It is not necessary for the officers to tell a suspect in explicit terms that he or she is being arrested, or to formally book a suspect at a police station in order to effectuate an arrest. *Id.* Rather, courts must look to the circumstances of each individual situation and determine whether, objectively, "a reasonable person in the defendant's position would have felt that he [or she] was under arrest or was 'otherwise deprived of his freedom of action in any significant way.'" *Knox*, 839 F.2d at 291 (quoting *Miranda v. Arizona*, 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

The Sixth Circuit has articulated three factors that can be considered to determine whether a police encounter is sufficiently intrusive to constitute an arrest: "(1) the conduct of the police, (2) the characteristics of the particular defendant, and (3) the physical surroundings of the encounter." *Richardson*, 949 F.2d at 857 (citing United States v. Grant, 920 F.2d 376, 382 (6th Cir.1990)). The first factor requires a consideration of such things as whether the officer is in uniform or in civilian clothing, whether the officer brandished a gun, whether the officer made physical contact with the suspect, and generally whether there was any "threatening, intrusive ... [or] coercive behavior" on the officer's part. *Grant*, 920 F.2d at 382. With respect to the second factor, it is necessary to determine whether the detainee possessed any characteristics which would make him or her particularly vulnerable to coercion, for example, a lack of familiarity with the English language or of police practices. *Id.* at 383. Finally, as to the third factor, the court must consider whether the physical setting of the encounter restricted the detainee's freedom of movement. *Id.*

In the instant case, the Court believes that immediately after Akins refused to answer

any further questions without the presence of his lawyer, he was not only seized, but his seizure was sufficiently intrusive to constitute an arrest. Out of the three factors enumerated in *Richardson*, the first and the last are the most relevant to the facts at present. In particular, Riddle's conduct towards Akins, which conducted of giving him his *Miranda* warnings, conducting a thorough search of his person, and compiling a personal history sheet on him, would lead any reasonable person to believe that he was being arrested. Though Akins was not expressly told that he was being formally arrested, he was processed consistently with what would be expected in an arrest situation. Furthermore, the setting in which the seizure occurred, the DEA interdiction office, was particularly constraining. Although it is true that Akins agreed to accompany Stewart to the room, once he was there, the room itself gave Stewart's actions a greater degree of officiality and authority. Akins' freedom of movement was also more greatly restricted in the DEA interdiction room than if he were interviewed at a public place. Finally, although not dispositive, it is notable that Riddle and possibly also Akins both believed that he was under arrest. Stewart admitted at the suppression hearing that he considered Akins to be under arrest since the time that he was being escorted to the interdiction room. TR1 at 73. Akins himself did not testify, however, the fact that he asked to speak with his lawyer almost immediately after he arrived at the DEA office indicates that he also most likely believed that he was in a custodial situation.

In *Richardson, supra*, the Sixth Circuit considered a fact pattern much less compelling than those here, and found that an arrest had occurred. The court recited the following facts: Four police officers had conducted surveillance of two individuals who they suspected of trafficking in narcotics. *Id.* at 854. The men had spent a large part of their day working in and around a storage locker, but the officers did not observe any illicit activity. *Id.* The four officers asked one of the suspects for consent to search the storage locker. When the suspect refused, the officers placed him in the police car. The court found that the suspect could have reasonably believed that he was under arrest

when, "after refusing to consent to a search . . . [he] was placed in the back of the police car by law enforcement agents who had no intent to allow him to leave." *Id.* Akins was placed in a similar situation when, after asking to speak to his lawyer, he was *Mirandized* and compelled to answer identification questions for a personal history sheet, by an officer who was not willing to let him leave. Thus, the Court concludes that Akins was arrested, not just stopped for investigatory purposes under *Terry*, when he was first taken to the interdiction room.

### C. Justification for the Arrest of Ronald Akins

As previously discussed, the Fourth Amendment requires that an arrest-type seizure be supported by probable cause. At the time that Akins was seized, the DEA agents had the following information about him: (1) his previous arrests on drug charges; (2) his suspicious flight arrangements—a short, overnight stay in Los Angeles, a source city, with reservations made close to the day of the flight, and tickets paid for in cash; (3) the similarities between his flight arrangement and those of Davidson and Odom, indicating that the three were traveling together; (4) his suspicious conduct at the airport, e.g., looking around and picking up the phone but not making a phone call; (5) the fact that he kept looking behind him as he walked down the concourse; (6) his immediate request to be searched when first approached by Stewart; (7) the fact that he was wearing two pairs of pants, a common way for drug carriers to hide contraband; (8) the fact that he denied being acquainted with Davidson; and (9) the fact that Odom had fled and been caught with a small packet of cocaine and a pill bottle which contained dilaudid.

Taken as a whole, the Court concludes that the evidence which was known to the officers at the time that they arrested Akins rises to the level of probable cause. The Court bases its decision primarily on two recent cases decided by the Sixth Circuit which are analogous to the facts in this case.

In the first case, *United States v. Taylor, supra*, the defendant arrived in the Memphis airport, having flown from Miami, Florida, a

source city for narcotics trafficking. 956 F.2d at 574. He was poorly dressed, but carried a brand-new shoulder bag. He walked very rapidly through the airport terminal, furtively looking around and behind him. He proceeded directly to the curb without retrieving any checked baggage. A couple of plain-clothed officers stopped him and identified themselves. In response to their questions, Taylor indicated that he lived in Haiti, Missouri and had been in Miami for three weeks. He could not explain his failure to have additional baggage to accommodate the length of his stay. He also produced a one-way ticket from Miami, which had been purchased in cash. He was "sweating profusely" as he interacted with the officers. One officer then asked Taylor if she could inspect the contents of his shoulder bag. Though Taylor insisted that the bag contained only gifts for his children, the officer noticed the presence of two large, spherical objects wrapped in brown plastic tape—which she recognized to be the common packaging for narcotics. Upon learning this information, the officers arrested Taylor. The packages later tested positively for the presence of cocaine. *Id.* The Sixth Circuit found that there was probable cause to arrest—particularly since the officers had made the "very incriminating discovery" that Taylor's bag contained items which resembled drug packages. *Id.* at 578.

In the second case, *United States v. Baro, supra*, drug interdiction officers were working undercover at the Northwest Airlines terminal in Detroit Metropolitan Airport. 15 F.3d at 565. The defendant, Baro, entered the terminal with a companion and asked the undercover officer where he could purchase a one-way ticket to Miami with cash. *Id.* at 565. The officer directed him to the appropriate counter, and watched while Baro purchased the ticket, apart from his companion, and walked toward his gate. *Id.* The agent then approached Baro, and asked him for his ticket and identification. Baro provided a driver's license which matched the name on his ticket. With Baro's consent, the agent searched his carry-on luggage and found two bundles which contained a large sum of cash. He found another bundle in Baro's waistband. *Id.* He later discovered that the cash totaled $14,190.00. When asked, Baro claimed that he had obtained the money by remortgaging his house, and had intended to use it to purchase a car in Detroit. *Id.*

The agent confiscated the bundles and informed Baro that they would be subjected to a canine sniff test. He was told that he was not under arrest, but that if he chose to board his flight, he would be required to leave the bundles with the agent. Baro's flight was scheduled to leave in five minutes. *Id.*

Baro elected to remain with his property, and accompanied the agent to the DEA office. Once there, a specially-trained dog indicated positively for the presence of drugs on the money. Upon further probing, Baro recanted part of what he had told the officers earlier, and indicated that he had actually obtained part of the money from the sale of his dry cleaning business, Casino Dry Cleaners. However, when the agent called directory assistance, he discovered that no listing was available for this business. Baro was later prosecuted and convicted of cocaine charges. *Id.*

On appeal, the Sixth Circuit determined that the evidence obtained during this encounter with the DEA agents should have been suppressed. *Id.* at 568. The court found that Baro's property—his cash—was seized at the point that the DEA officer informed Baro that he would be confiscating his property for the purposes of subjecting it to a canine sniff. *Id.* at 567. This seizure, the court noted, was not supported by probable cause. *Id.* The court enumerated the information that the agents had at the time they seized Baro's property: (1) his travel to a source city, Miami; (2) his arriving shortly before the flight and purchasing a one-way ticket with cash; (3) his attempt to hide the fact that he was traveling with another person; (4) his looking around as he walked through the airport; (5) his carrying $14,-190.00 in cash; and (6) his unlikely explanation for the source of his money. *Id.* at 567–68. The court observed that his manner of travel, and his nervousness, although not inherently suspicious, were relevant factors to be considered in determining probable cause. *Id.* at 568. His attempt to hide the fact that he was traveling with someone also indicated

possible criminal conduct. *Id.* However, the court held that the remaining factors had only limited probative value. The fact that he purchased his ticket with cash, a transaction which would afford anonymity, was countered by the fact that the ticket was under his own name. *Id.* Furthermore, his evasive statements regarding the source of his funds provided only "inchoate and unparticularized suspicion." *Id.* (quoting *$53,082*, 985 F.2d at 250). Finally, there was no reason to believe that the currency itself was illegally obtained. *Id.* The court held that taking all these factors into consideration, there was no probable cause to seize the money. *Id.* It noted that "the absence of contraband distinguishes this case from *Taylor*, where this Court, addressing many of the same factors highlighted by the government here, found that the officers had probable cause to arrest the suspect." *Id.*

This last sentence is particularly indicative of what factors the Sixth Circuit finds significant to the question of whether probable cause to arrest exists. Where only limited circumstantial evidence exists, probable cause is not present. However, if, in addition to limited circumstantial evidence, officers have some concrete evidence to believe that a suspect possesses contraband, probable cause can be established.

As applied to Akins, the Court believes that a careful reading of *Taylor* and *Baro* militate in favor of finding probable cause to arrest. The facts under which Akins was arrested are closely analogous to the facts present in both of those cases. As in both *Taylor* and *Baro*, Akins' travel arrangements were typical of the method of travel of drug couriers. Furthermore, Akins, like Taylor and Baro, exhibited unusual behavior by the fact that he immediately threw his hands up in the air when Stewart approached him, and even began to pull down his pants. *See Taylor*, 956 F.2d at 578 (subject "sweated profusely"); *Baro*, 15 F.3d at 568 (suspect appeared agitated and nervous). As was the case with Taylor, Akins also appeared to be hiding the fact that he was traveling with someone. *See Taylor*, 956 F.2d at 578. Baro exhibited similarly evasive conduct in that as he walked through the airport, he furtively glanced around in all directions. *Baro*, 15 F.3d at 568. Finally, as in *Baro*,

Akins was carrying a significant amount of money in cash, and gave an unlikely explanation for the source of his funds. *Id.*

The Court acknowledges that some of the factors that could arguably support probable cause in Akins' case are only of limited evidentiary value. For example, the facts that Akins was overly-eager when Stewart first approached him, and would not allow Davidson to answer the officer's questions, are countered by the fact that he voluntarily allowed himself to be searched. Furthermore, the fact that he paid for his ticket in cash was, as in *Baro*, offset by the fact that he used his real name. Finally, it is also notable that although Akins was wearing two pairs of pants, which is a common method of hiding drugs, when Stewart searched him, he found no evidence of contraband on his person.

Nevertheless, the Court finds that the DEA agents had knowledge of sufficient information to lead them to reasonably believe that Akins was committing an offense. Of particular significance was Stewart's knowledge that Odom had attempted to flee, and that packets which appeared to contain controlled substances fell from his person when he was tackled. As in *Taylor*, this item of information provided a sufficient nexus to illegal activity to justify Akins' arrest.

It is true that the substances which appeared to be contraband were not directly found on Akins' person. However, the manner in which Akins' and Odom's flight arrangements coincided, and the way that the two men glanced at each other in the airport gave the officers a reasonable basis for believing that they were traveling together. When it is reasonable to believe that two individuals are co-conspirators, officers may use the evidence of contraband found in one individual to support their seizure of his or her companion.

In *United States v. Williams*, 949 F.2d 220 (6th Cir.), *cert. denied*, 504 U.S. 958, 112 S.Ct. 2308, 119 L.Ed.2d 229 (1992), for example, two suspects were seen to get off a bus, walk to a car, and then walk down the street together. When approached by officers, they both fled. *Id.* at 221. One of the suspects was also observed to rip open a bag and

discard its contents, which appeared to be crack cocaine, as he ran. *Id.* The Sixth Circuit agreed that the police officers had probable cause to arrest the individual who was not seen to be in possession of the cocaine, because it was reasonable to believe that the two men were acting in concert. *Id.*

 Thus, the Court concludes that while Akins was arrested at the time that he was given *Miranda* warnings at the DEA interdiction room, the arrest was supported by probable cause. Accordingly, the evidence obtained from Akins after his arrest, including the itinerary found on his wallet, and his statement that he told Odom to say that the drugs were his, are not the result of an illegal search or seizure. The admission of the wallet and the $3,000 cash can be justified as an inventory search subsequent to arrest. *See LaFayette,* 462 U.S. at 648 (police may conduct inventory search of arrestee). Even if Riddle's search of the wallet was not conducted pursuant to a valid inventory search at the DEA interdiction room, however, the wallet is admissible on the basis of the inevitable discovery doctrine. Since Akins was to be taken down to the police station in any event, the police there would presumably conduct an inventory search of all his possessions incidental to their booking procedure. TR1 at 115; *see Nix,* 467 U.S. at 447 (evidence is admissible if it would have been inevitably discovered). In addition, Akins' statement to the effect that he told Odom to say the drugs were his is admissible. Although Akins had already asserted his right to counsel at this point, Stewart did not violate this right by asking questions which were reasonably calculated to elicit incriminating statements. *See Rhode Island v. Innis,* 446 U.S. 291, 302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ("questioning" includes statements by officers which are "reasonably likely to elicit an incriminating response"). The record shows that at the time that Akins made this remark, Stewart was merely completing a personal inventory sheet. This statement was initiated entirely by Akins, and was not given in response to any of Stewart's questions. *See* TR1 at 29.

**D.** *Seizure of the Automobile and the Cash Found Inside*

 Officers Stewart and Riddle seized Odom's BMW pursuant to federal forfeiture law. TR2 at 194. In order to establish whether the seizure of the automobile violated the Defendants' Fourth Amendment rights, therefore, the Court must determine first, whether the police officers were justified in seizing the vehicle without a warrant, and second, whether the police had probable cause to believe that the Defendants had violated the forfeiture law. The federal forfeiture law, embodied in 21 U.S.C. § 881(a)(4) provides that any person convicted of a controlled substances violation shall forfeit:

> All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [controlled substances].

(West Supp.1997).

 In *United States v. Decker,* 19 F.3d 287 (6th Cir.1994) (per curiam), the Sixth Circuit adopted the rule in sister circuits that "where police have probable cause to believe a car is subject to forfeiture, or have validly seized a car for forfeiture, the police may search the car without a warrant." *Id.* at 290 (quoting *United States v. Pace,* 898 F.2d 1218, 1244–45 (7th Cir.1990)). Thus, the officers in this case were not required to obtain a warrant to seize or search the BMW, if they in fact had probable cause to believe that the car was used to facilitate the transport, receipt, or possession of narcotics.

 At the time they seized the BMW, Officers Stewart and Riddle had obtained the following information: First, they discovered the bag of cocaine in Odom's possession. They had also heard inculpatory statements from both Akins and Odom which could reasonably have led them to believe that the men were involved in a drug conspiracy.[4] In addition, they were in possession of Akins' key ring, which contained a key for a BMW,

---

**4.** Stewart had heard Akins say, "I told them to say the dope was theirs." TR1 at 79. Odom had also purportedly expressed to Riddle, "When you're caught, you're caught. You got me." TR1 at 111.

and knew that a car which matched Akins' license plates had been parked at the airport since forty minutes prior to when Akins' flight was scheduled to depart. TR1 at 117. When they located the car, and before they seized it, Stewart noticed that a Tennessee identification card with the name of "Carmack Odom" was visible on the dash of the car. TR1 at 34–35. The Court concludes that this information was more than adequate to lead the officers to believe that the car had been used to transport Akins, Davidson, and Odom to the airport, to facilitate the transport of a large quantity of cocaine. Thus, the officers had probable cause to seize the car and conduct a preforfeiture search of its contents. *Decker*, 19 F.3d at 290. The opening of the locked storage box was permissible because the officers could have found evidence of narcotics or narcotics proceeds in a box of that size, *see United States v. Ross*, 456 U.S. 798, 824, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (if police have probable cause to search a vehicle, they may also search any container in the car which may contain items which are the object of the search), and also as part of an inventory search of the vehicle's contents. *See Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990) (department inventory procedures may give police officers a wide degree of latitude in determining which closed containers to open in inventory search of car.)

E. *Would the Introduction of the Evidence of the Canine Search of the Cash Violate Akins' Fourteenth Amendment Rights or Constitute Irrelevant Evidence?*

Akins contends that the officer's immediate conversion to a cashier's check of the cash found on his person, and that found in the locked box in his car, violated his Fourteenth Amendment rights. (Akins' Proposed Findings of Fact and Conclusions of Law at 21.) He further contends that the evidence that specially-trained dogs alerted for the presence of drugs on these two quantities of money should be inadmissible at trial as irrelevant evidence. (*Id.* at 23–24.) In support of these claims, Akins submits that he was prejudiced by the fact that he was not present at the time that the two quantities of cash were subjected to a canine search, and

that the conversion of the cash prevented him from testing the cash himself for the presence of drugs. (*Id.* at 22.) He further contends that such a test could have proven to be exculpatory, given the fact that canine searches are inherently unreliable. (*Id.*) In addition, he challenges the method in which the officers conducted the search. As the officers testified, when the $3,000 was subjected to the search, the money was kept inside the desk drawer of one of the officers. The canine thus did not indicate that the money itself was tainted with the smell of drugs, but merely that something in the desk drawer was. (*Id.* at 24–25.) Finally, he contends that the search of the money found in his car was also unreliable because the police officers waited approximately fourteen hours before testing it.

█ In order to prove a Fourteenth Amendment violation arising out of police officers' handling of evidence, the defendant must prove that the police, in bad faith, failed to preserve potentially exculpatory evidence. *Arizona v. Youngblood*, 488 U.S. 51, 57–58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The duty of police to preserve evidence for testing arises out of the decision in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), where the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. When applying this principle to the conduct of police as opposed to prosecutors, however, proof of bad faith is necessary. *Youngblood*, 488 U.S. at 58. This requirement frees courts from the difficult task of determining the possible exculpatory value of evidence that no longer exists. *Id.* Furthermore, it limits the exclusion remedy to those compelling cases where the police themselves believed that the evidence was potentially exculpatory, and for this very reason failed to preserve it. *Id.*

█ In the instant case, however, Akins has offered no evidence to show that the officers acted in bad faith in converting the money to a cashier's check. The officers

testified at the suppression hearing that it was standard policy to exchange any cash which they have confiscated from an arrestee for a cashier's check. TR1 at 60–61, 112. There is no proof that the officers acted pursuant to any other objective in exchanging the cash other than to follow standard policy. Furthermore, Akins has not presented evidence to show that the policy of exchanging the money itself was instituted with bad faith—in other words, to deprive defendants of an opportunity to test the validity of the dog alert. In fact, it appears that all cash obtained by the DEA office as a result of an arrest is converted to a cashier's check, regardless of whether the money was sniffed by a specially trained dog. *Id.* Moreover, such a policy is based on sound rationale, given the fact that it is administratively easier to inventory and be responsible for a cashier's check than a bundle of cash. Thus, Akins has failed to show that the Government should be foreclosed from admitting at trial evidence that the cash indicated positive for the smell of cocaine due to a violation of his Due Process rights.

However, Akins has also asserted that the evidence of the dog sniff should still be inadmissible due to the fact that it is not relevant under Rule 401 of the Federal Rules of Evidence. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence ." Fed.R.Evid. 401. The Court believes, however, that the proper inquiry to be made with regard to whether the Federal Rules of Evidence bar the admission of the dog sniffs is under Rule 403. Rule 403 permits a court to exclude otherwise relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice."

Several recent opinions have discussed the unreliability of canine sniff searches of money. The Sixth Circuit, in particular, has noted that "the evidentiary value of a narcotics detection dog's alert has recently been called into question." *$53,082.00*, 985 F.2d at 250 n. 5; *see also United States v. $5,000 in U.S. Currency*, 40 F.3d 846, 849–850 (6th Cir.1994) (positive indication by dog that money was contaminated with narcotics was insufficient to support probable cause, particularly when suspects were not allowed in room during search). It based this observation primarily on a Texas case, *United States v. $80,760.00 in U.S. Currency*, 781 F.Supp. 462, 475 & n. 32 (N.D.Tex.1991), and an article in the Washington Post, which described the extent to which the money supply has been tainted with traces of narcotics. The court in *$80,760.00* cited studies which found that up to 96% of the currency currently in circulation, would, if subjected to a narcotics dog sniff, alert positively for the presence of controlled substances. *Id.* It therefore concluded that courts should "seriously question the value of a dog's alert *without other persuasive evidence ...." Id.* at 476 (and cases cited therein) (emphasis added).

■ In this district, at least one court has concluded that the probative value of evidence of a dog's alert to the presence of drugs is so "microscopic" as to be inadmissible. *See Jones v. United States Drug Enforcement Administration*, 819 F.Supp. 698, 720 (M.D.Tenn.1993) (noting that contamination in currency is widespread and that a narcotics dog can detect traces of drugs in parts per trillion). This Court declines to take such a blanket approach to this question, however, finding instead that the issue of whether such evidence should be admitted should turn on the strength of the evidence against the defendant. *See United States v. Saccoccia*, 58 F.3d 754, 777 (1st Cir.) (evidence of a dog alert still retains some probative value despite widespread contamination of currency), *cert. denied*, 517 U.S. 1105, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996); *$80,-760.00*, 781 F.Supp. at 477 (concluding that such evidence is admissible if police can link the defendant to the narcotics through other, more direct methods). This distinction would be consistent with the purpose of exclusion of evidence based on Rule 403. When the Government can prove through other evidence that the defendant was in some way connected to drugs, the admission of the dog alert will not unduly prejudice the defendant. However, when the evidence of the dog alert is supported only by other circumstantial evidence, its admission may unduly prejudice the defendant. This is par-

ticularly true since in a weaker case the jury may tend give such evidence greater weight.

Under the present facts, the Court finds that while the dog sniff test of the money found in the trunk of the car is admissible, the sniff test of the $3,000 found on Akins' person is not. This is a case where the police have direct evidence of Akins' connection to illicit activity—namely the large amount of drugs which they found in Odom's bag. Thus, the Government will not be relying extensively on the dog sniff in its case against Akins. The evidence of the dog alert of the money found in the trunk is thus admissible as not being unduly prejudicial.

Akins points to the fact that the money was in the trunk of the car for a couple of days before the car was impounded, and that even then the officers waited several hours to test the money, as evidence that the test was unreliable. However, the length of time before the testing can also cut the other way. It could also mean that the trace of narcotics on the money was particularly strong, since it lingered for several hours. Of course, the Defendants are free to point out both the studies which show the unreliability of dog sniffs, and the fact that the money was not tested for several hours, to discredit the evidence at trial. It will then be up to the jury to decide how much credence should be given to the test. The Court believes that the jury can hear and balance this evidence without being unduly prejudiced.

The evidence of the dog alert to the $3,000 found on Akins' person, however, is another matter. In particular, the fact that the money itself was not given to the dogs, but rather stored in a drawer in the desk, distinguishes this test from that of the money found in the trunk. It is impossible to know what other substances were stored in the same desk drawer that contained the money. This was, after all, the DEA interdiction room where presumably other confiscated narcotics were stored. The dog could very well have alerted to some other object that was contained in the desk drawer, and thus the test of the $3,000 has a higher potential of being inaccurate. Applying the standard of Rule 403, the Court finds that the probative value of this test is extremely limited, and given the general apprehensions as to the reliability of dog alerts, the admission of this evidence would be unfairly prejudicial.

### F. Severance

The last issue the Court must address is whether it should grant Akins' request to sever his trial from that of his co-defendant, Carmack Odom. As grounds for this request, Akins submits that if the trials were severed, Odom would testify that Akins was not aware that he was carrying the stash of cocaine. Odom would be prevented from doing so at a joint trial without waiving his Fifth Amendment right against self-incrimination. He further asserts that the evidence against him is weaker than that against Odom, and that the jury in a joint trial may be tempted to transfer some of Odom's culpability onto Akins.

Generally, it is preferred that defendants who are indicted together are also tried together. *United States v. Cobleigh*, 75 F.3d 242, 247 (6th Cir.1996). Juries are presumed to be capable of separating the evidence against each defendant and of judging each defendant individually. *Id.* However, when it is clear that "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants," courts should order separate trials. *Id.* at 248 (quoting Zafiro v. United States, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)). In order to prevail on a motion to sever based on a codefendant's testimony, the movant must demonstrate: "(1) a bona fide need for the testimony, (2) the substance of the testimony, (3) its exculpatory nature and effect, and (4) that the codefendant will in fact testify if the cases are severed." *United States v. Causey*, 834 F.2d 1277, 1287 (6th Cir.1987) (citations omitted); *accord Cobleigh*, 75 F.3d at 248.

Applying these factors to the case at hand, it is clear that Akins has shown the need to be tried separately from co-indictee Odom. First, Akins has provided sufficient detail as to what the substance of Odom's testimony on his behalf would be. Odom testified at the suppression hearing that Akins had flown with him to Los Angeles because he wanted to purchase a vehicle that Odom had told him about. TR2 at 232. He

also testified that Akins was not aware that he was carrying that quantity of cocaine in his bag, or that he had traveled to Los Angeles to purchase drugs. *Id.* at 244. Second, the exculpatory value of and the need for this testimony is apparent, as it is direct evidence that Akins was not involved in the drug conspiracy for which he is charged. Finally, although Odom did not say in explicit terms at the suppression hearing that he would be willing to testify on behalf of Akins at his trial, it is significant that Odom did exculpate Akins while on the stand. Thus, even if he later chooses not to testify, or testifies differently, Akins could admit the testimony of the suppression hearing at his trial. If Odom invokes his Fifth Amendment right at Akins' trial, Akins can admit his testimony under Rule 804(a)(1) of the Federal Rules of Evidence, as a hearsay exception for a declarant who is unavailable. Furthermore, if Odom changes his story at Akins' trial, Akins could still admit his testimony at the suppression hearing as nonhearsay inconsistent testimony under Rule 801(d)(1).

Thus, the Court concludes that Akins and Odom should be tried separately.

## III. CONCLUSION

The Court finds that the Defendants' Fourth Amendment rights were not violated so as to justify the suppression of: (1) the drugs found in Odom's bag and on Odom's person; (2) any statements that Odom made to police after he was arrested; (3) the itinerary in Akins' wallet showing his, Davidson's, and Odom's flight arrangements; (4) Akins statement to Stewart to the effect that he told Odom to say the drugs were his; and (5) the money found in Akins' car for which a dog alerted positively for the presence of dugs. However, the Court finds that under Federal Rule of Evidence 403, the evidence that a specially trained dog indicated that there were traces of drugs in the $3,000 found on Akins' person is not admissible at trial. Furthermore, the Court orders the trials of Akins and Odom to be severed. Carmack Odom's trial is hereby rescheduled for April 14, 1998 at 9:00 a.m. Ronald Akins' trial remains scheduled for April 21, 1998 at 9:00 a.m.